**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AGUDAS CHASIDEI CHABAD OF UNITED STATES

Plaintiff,

v.

STATE DEVELOPMENT BANK VEB.RF,

Movant,

v.

RUSSIAN FEDERATION, RUSSIAN MINISTRY OF CULTURE AND MASS COMMUNICATION, RUSSIAN STATE LIBRARY, and RUSSIAN STATE MILITARY ARCHIVE,

Defendants.

Misc. Case No. 19-mc-271-LAK

Underlying Case in the U.S. District Court for the District of Columbia, Civil Action No. 1:05-cv-01548-RCL

**CHABAD'S OPPOSITION TO VNESHECONOMBANK'S MOTION TO QUASH**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 3

ARGUMENT ..... 6

I. Chabad is Entitled to Discovery of VEB ..... 6

II. Chabad is Not Seeking Irrelevant Documents and Information ..... 7

III. The Foreign Sovereign Immunities Act Does Not Shield VEB from Discovery ..... 11

IV. Chabad's Discovery Requests Are Not Overbroad ..... 13

V. VEB's Arguments Regarding the U.S. National Interest Should Be Disregarded ..... 13

VI. There is No Basis to Stay Chabad's Subpoena ..... 14

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

## Cases

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
528 F.3d 934 (D.C. Cir. 2008) .......... 1, 3, 4

*Agudas Chasidei Chabad of United States v. Russian Federation*,
128 F. Supp. 3d 242 (D.D.C. 2015) .......... 1, 5

*Agudas Chasidei Chabad of United States v. Russian Federation*,
729 F. Supp. 2d 141 (D.D.C. 2010) .......... 4, 12

*Agudas Chasidei Chabad of United States v. Russian Federation,*
915 F. Supp. 2d 148 (D.D.C. 2013) .......... 1, 5

*Agudas Chasidei Chabad of United States v. Russian Federation*,
466 F. Supp. 2d 6 (D.D.C. 2006) .......... 1

*Agudas Chasidei Chabad of United States v. Russian Federation*,
798 F. Supp. 2d 260 (D.D.C. 2011) .......... 4, 5, 12

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
150 F.3d 172 (2d Cir. 1998) .......... 8

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983) .......... 8, 10

*Funnekotter v. Agricultural Development Bank of Zimbabwe*,
No. 13-cv-1917, 2015 WL 3526661 (S.D.N.Y. June 3, 2015) .......... 8

*Magness v. Russian Fed'n*,
84 F.Supp.2d 1357 (S.D.Ala.2000) .......... 12

*Republic of Argentina v. NML Capital, Ltd.,*
573 U.S. 134 (2014) .......... 2, 6, 7, 13

*Walters v. Industrial & Commercial Bank of China, Ltd.*,
651 F.3d 280 (2d Cir. 2011) .......... 12

## Statutes

22 U.S.C. § 2459 .......... 12

28 U.S.C. § 1602 .......... 4

28 U.S.C. § 1608(e) .......... 5, 12

28 U.S.C. § 1610(a) .......... 5, 12

28 U.S.C. § 1610(a)(3) .......... 13

28 U.S.C. § 1610(b) .......... 5, 12

28 U.S.C. § 1610(c) .......... 2, 4, 11, 12

**Other Authorities**

N.Y. Civ. Prac. Law Ann. § 5223.4 .......... 6

**Rules**

Fed. R. Civ. P. 26(b)(1) .......... 6

## INTRODUCTION

Agudas Chasidei Chabad of United States ("Chabad") respectfully submits this Opposition to Vnesheconombank ("VEB" or "VEB.RF") Motion to Quash. VEB's Motion is directed to document and testimonial subpoenas that Chabad issued as part of its decades-long effort to recover sacred and religious texts that were confiscated by, and remain in the unlawful possession of, the government of the Russian Federation.

Chabad has litigated against the Russian government before Judge Royce Lamberth in the U.S. District Court for the District of Columbia for over a decade as a part of an ongoing effort to recover sacred religious texts stolen from Chabad during the Russian Revolution and World War II. *See Agudas Chasidei Chabad of United States v. Russian Fed'n*, 466 F. Supp. 2d 6 (D.D.C. 2006) (Lamberth, J.); *see also Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934 (D.C. Cir. 2008). The litigation resulted in a judgment against the Russian Federation and the other Defendants, followed by the entry of an order that Russia is in contempt of the district court's judgment and the imposition of contempt sanctions in the amount of $50,000 per day. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 915 F. Supp. 2d 148, 155 (D.D.C. 2013). The district court entered a portion of the accumulated sanctions as a money judgment against Russia, sanctions now totaling over $100 million. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 128 F. Supp. 3d 242, 249 (D.D.C. 2015). Chabad is now seeking discovery from VEB in an effort to enforce those judgments.

VEB's motion to quash should be denied. The motion rests on legal and factual premises that are incorrect or that have already been resolved by the district court in the District of Columbia. For example, the question whether sanctions are appropriate in this case has been

resolved. The question of whether Chabad's discovery is consistent with the Foreign Sovereign Immunities Act ("FSIA"), and particularly 28 U.S.C. § 1610(c), has been decided. VEB offers no good reason why this Court should revisit those issues.

Moreover, VEB does not address head-on the central issue it raises: whether Chabad is entitled to take discovery of VEB in an effort to identify assets of the Russian Federation that could be used to satisfy the district court's judgments. As a legal matter, the standard to be applied is the one adopted by the Supreme Court in *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 134 S. Ct. 2250 (2014): discovery may be had to identify assets to satisfy a judgment entered against a foreign sovereign in accordance of the Federal Rules of Civil Procedure, and should be allowed unless the discovery requests are somehow, well, bizarre (to use the Supreme Court's language). *Id.* at 144, 134 S. Ct. at 2257. As a factual matter, VEB acknowledges that it is a creature of the Russian Government, that it was established and currently operates under Russian law, and that one of its main purposes is provide financing to Russian companies in various industries.

VEB contends that it is an independent entity, wholly separate from the Russian Federation – more akin to Eximbank than (say) AID. Publicly available information from the U.S. Government, VEB itself, and news sources, however, raise questions as to VEB's independent status, confirming Chabad's right to post-judgment discovery. VEB also raises a number of subsidiary arguments for denying (or delaying) Chabad's discovery, none of which has merit. VEB's Motion to Quash should therefore be denied.

Finally, to the extent that VEB's substantive arguments need to be addressed, Chabad respectfully requests that VEB's Motion to Quash be transferred to Judge Lamberth in the U.S. District Court for the District of Columbia, where Judge Lamberth is currently considering the

exact same legal issues in the context of a pending motion to quash by a different entity. As described in more detail in Chabad's concurrently filed Motion to Transfer, transferring this subpoena dispute is both efficient and proper under Federal Rule of Civil Procedure 45(f).

## BACKGROUND

Briefly, Chabad is a non-profit religious organization incorporated in the State of New York. Chabad is the inheritor and embodiment of 240-year old movement within Orthodox Judaism known as Chabad Chasidism. The organization's religious and operational leader is known as the "Rebbe." The property at issue in Chabad's dispute with Russia includes sacred books, texts and manuscripts materials compiled by the Rebbes between the organization's founding in the 18th century to the early 20th century: specifically, 12,000 books and manuscripts (the "Library") and 25,000 pages of documents and other materials (the "Archive") (together, the "Collection"). "The religious and historical importance of the Collection to Chabad . . . can hardly be overstated." *Agudas Chasidei Chabad of United States v. Russian Federation,* 528 F.3d 934, 938 (D.C. Cir. 2008).

During World War I, as the German army advanced into Russian territory, the then-presiding Rebbe (the Fifth Rebbe) placed the Library in storage. The Library fell prey to Germany's opponents, however, and the Soviet government seized the Library, which it (and its successor, the government of the Russian Federation) has held to this day.

In 1927, the Soviet government arrested the Sixth Rebbe and sentenced him to death, but ultimately allowed him to leave the country. With the Archive in tow, the Sixth Rebbe settled in Poland. When the Nazi regime and the Soviet Union invaded Poland in 1939, the Sixth Rebbe fled to the United States; unfortunately he had no choice but to leave the Archive behind. The

Nazis seized the Archive and shipped it to Germany. At the end of World War II, the Soviets found the Archive and victoriously claimed it as "trophy documents." Thus, the Archive, too, ended up in the possession of the Soviet, and now the Russian Federation, government.

Chabad has tried to reclaim its property through judicial channels in the Soviet Union, and then the Russian Federation, but the Russian Government has intervened to prevent their return. Both the Library and the Archive remain in Russia's possession and control. *See Agudas Chasidei Chabad of United States v. Russian Fed'n*, 729 F. Supp. 2d 141, 147 (D.D.C. 2010).

In 2004, Chabad brought suit against the Russian Federation, the Russian Ministry of Culture and Mass Communication, the Russian State Library, and the Russian State Military Archive (together, "Russia" or "Defendants") to recover its property. Russia asserted the defense of foreign sovereign immunity. Following a decision in the district court, both parties appealed to United States Court of Appeals for the D.C. Circuit, which held that Chabad's suit could proceed. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 528 F.3d 934, 939 (D.C. Cir. 2008). On remand, the Defendants declined to participate further in the lawsuit.

Back in the district court, Chabad followed the procedural steps spelled out in the FSIA, 28 U.S.C. §§ 1602, *et seq.,* and moved for a default judgment. The district court found that Russia "unlawfully possess[es] and refuse[s] to relinquish" the Collection, 729 F. Supp. 2d at 145 (D.D.C. 2010), and held that the materials were taken in violation of international law. *Id.* at 146. The court ordered the Defendants to return the materials, Ex. A, but Russia has refused, and continues to refuse, to comply with the Court's ruling. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 798 F. Supp. 2d 260, 264-65 (D.D.C. 2011).

Following another series of FSIA-required proceedings, the district court entered an order authorizing Chabad to take steps to enforce the district court's judgment. *Id*. at 271 (issuing an

order "to permit [Chabad] to establish that one of the prerequisites [for attachment] is satisfied so that [it] may pursue specific attachments without worry over any lingering § 1610(c) requirements").[1] Chabad also moved for civil contempt sanctions. The court concluded that sanctions were appropriate, and entered an order requiring Defendants to pay Chabad $50,000 for each day that they failed to comply with the court's order. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 915 F. Supp. 2d 148 (D.D.C. 2013); Order (Dkt. 115). Russia continues to ignore the district court's judgment. The district court has reduced a portion of the accrued sanctions to a monetary judgment. *Agudas Chasidei Chabad of United States v. Russian Fed'n*, 128 F. Supp. 3d 242, 249 (D.D.C. 2015). Sanctions continue to accrue.

Chabad has since entered into the enforcement discovery stage of the litigation. Pursuant to Rules 45 and 69 of the Federal Rules of Civil Procedure, Chabad served subpoenas on the movant, Vnesheconombank ("VEB" or "VEB.RF"). VEB is a bank established by the Russian Federation. As detailed below, VEB is intertwined with the highest reaches of the Russian Federation, a point confirmed when the U.S. Government imposed sanctions on VEB in connection with Russia's annexation of Crimea. Indeed, VEB appears in the recent and much-publicized "Mueller Report" for its role as an agent of the Russian Federation. In these circumstances, Chabad's efforts to find our whether VEB holds Russian Federation assets—and

---

[1] The FSIA, 28 U.S.C. § 1610(c), requires a court to determine (1) that "a reasonable period of time has elapsed following the entry of judgment", and (2) the "the giving of any notice required under section 1608(e) of this chapter" has occurred. Separately, a court has to determine if attachment is proper under Sections 1610(a)-(b). 798 F. Supp. 2d at 271 (citations omitted).

indeed whether VEB may itself be considered an asset of the Russian Federation—is justified, necessary, and appropriate.

## ARGUMENT

### I. Chabad is Entitled to Discovery of VEB

"The rules governing discovery in postjudgment execution proceedings are quite permissive." *Republic of Argentina v. NML Capital, Ltd.,* 573 U.S. 134, 138, 134 S. Ct. 2250, 2254 (2014). "The general rule in the federal system is that, subject to the district court's discretion, '[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.'" *Id.* at 139, 134 S. Ct. at 2254 (quoting Fed. R. Civ. P. 26(b)(1)). Nonetheless, VEB contends that Chabad is not entitled to any discovery relevant to its efforts to enforce two judgments against the Russian Federation.

*NML Capital*, like the present dispute, concerned efforts to locate assets that might be available to satisfy a judgment against a foreign sovereign. Like VEB, Argentina challenged the judgment-beneficiary's discovery request on a host of legal and policy grounds. The Supreme Court rejected the arguments *in toto*, and in particular ridiculed the idea that the issues raised could be decided before discovery even took place:

> Argentina maintains that, if a judgment creditor could not ultimately execute a judgment against certain property, then it has no business pursuing discovery of information pertaining to that property. But the reason for these subpoenas is that NML *does not yet know* what property Argentina has and where it is, let alone whether it is executable under the relevant jurisdiction's law. If, bizarrely, NML's subpoenas had sought only "information that could not lead to executable assets in the United States or abroad," then Argentina likely would be correct to say that the subpoenas were unenforceable—not because information about nonexecutable assets enjoys a penumbral "discovery immunity" under the Act, but because information that could not possibly lead to executable assets is simply not "relevant" to execution in the first place, Fed. Rule Civ. Proc. 26(b)(1); N.Y. Civ.

> Prac. Law Ann. § 5223.4. But of course that is not what the subpoenas seek; they ask for information about Argentina's worldwide assets generally, so that NML can identify where Argentina may be holding property that is subject to execution. To be sure, that request is bound to turn up information about property that Argentina regards as immune. But NML may think the same property not immune. In which case, Argentina's self-serving legal assertion will not automatically prevail; the District Court will have to settle the matter.

*NML Capital, Ltd.,* 573 U.S. at 144–45, 134 S. Ct. at 2257–58.

To be sure, Chabad did not serve VEB with "bizarre" subpoenas directed to irrelevant discovery. On the contrary, Chabad's subpoenas seek information regarding VEB's connections to the Russian Federation and information relevant to whether VEB holds Russian Federation assets that may available to satisfy the district court's judgments favoring Chabad. That should be the end of the matter—as the Supreme Court in *NML* held, challenges as to whether assets are ultimately attachable should be adjudicated on the merits, after the discovery is complete.

Nonetheless, as detailed in Section II, Chabad's explains why VEB's motions are not only procedurally incorrect, but fail on the merits as well.

## II. Chabad is Not Seeking Irrelevant Documents and Information

The main thrust of VEB's motion to quash is that Chabad's subpoenas fall within the *NML Capital* "bizarre" category – that is, they seek "information that could not lead to executable assets in the United States or abroad." Not so. The subpoenas, in fact, are directed to determining whether the conclusory contentions VEB put forward in its motion are in fact sufficient to shield VEB assets from attachment. Under *NML Capital,* the proper procedure is *not* to take these assertions at face value but (short of "bizarre" circumstances) let discovery run its course.

Moving to the substance of VEB's arguments, Chabad acknowledges the presumption that VEB, although established and operating under Russian law and for the purposes of

implementing Russian sovereign policy, is a separate juridical entity from the Russian Federation. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 103 S. Ct. 2591 (1983) ("*Bancec*"). This presumption can be disregarded in two situations: "(1) when 'a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created,' and (2) when treating the entities separately 'would work fraud or injustice.'" *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998) (quoting *Bancec*, 462 U.S. at 629, 103 S. Ct. at 2601). Even assuming that the question of piercing the corporate veil is both relevant and ripe at this time, there is no mechanical formula for determining when an entity may be considered the state for purposes of assigning liability; instead, courts look to the totality of the circumstances surrounding the relationship between the parties.

The analysis in *Funnekotter v. Agricultural Development Bank of Zimbabwe*, No. 13-cv-1917, 2015 WL 3526661 (S.D.N.Y. June 3, 2015), in which Judge McMahon (following an earlier decision by Judge Forrest) found "sufficient evidence in the record from which a reasonable factfinder could infer that ZB Bank is an alter ego of the Zimbabwean Government," therefore making summary judgment inappropriate, is instructive. *Id.* at *14. A major point supporting the court's decision was the fact that the U.S. Treasury's Office of Foreign Assets Control ("OFAC") had imposed sanctions on ZB Bank in connection with the actions of the Zimbabwe Government. Given the fact that the U.S. Government imposed the sanctions on ZB Bank in light of its connections to the Zimbabwe Government, and given the deference due the U.S. Government's action, the Court found there to be persuasive evidence that ZB Bank was an alter ego of the Zimbabwe Government. *Id.* at *17.

As in *Funnekotter*, the Russian "government treats [VEB] as an instrument for the ends of its incumbent regime." *Id.* at *17. VEB is an "alter ego" of the Russian Federation, far from the independent entity described in the motion to quash. VEB's "highest governing body" is chaired by the Russian Prime Minister. Ex. B, at 2. VEB and the Russian Federation share a common goal—VEB's development strategy is Russia's development strategy. *Id.* VEB implements Russian presidential decrees, *id.*, and "operate[s] in close contact with federal executive authorities responsible for the implementation of the economic and industrial policy (Russian Ministry of Economic Development, Russian Ministry of Industry and Trade, Russian Ministry of Transport)," Ex. C, at 19.

The U.S. Government has also identified VEB's close connections to the Russian Federation. As in *Funnekotter*, the U.S. Treasury imposed sanctions on Russia for actions taken in Crimea and elsewhere, and Treasury has included VEB on the list of sanctioned entities. Specifically, Treasury describes VEB as a "development bank and payment agent for the Russian government," and imposed sanctions "in response to Russia's continued attempts to destabilize eastern Ukraine and its ongoing occupation of Crimea." Ex. D. More recently, the Department of Justice's Report on the Investigation into Russian Interference in the 2016 Presidential Election (the "Mueller Report") described Sergey Gorkov, head of the VEB, as "someone who had a direct line to [Russian President] Putin." Ex. E, at 161.

Journalists have uncovered additional material on VEB. A New York Times article reported that VEB plays a special role in Russia's foreign affairs:

> Despite this presence on Wall Street, detailed in previously unreported financial records, Vnesheconombank, or VEB, is no normal bank. It is wholly owned by the Russian state. It is intertwined with Russian intelligence. And the Russian prime minister is, by law, the chairman of its supervisory board.

> . . . .
>
> "This is not a bank," said Karen Vartapetov, a public finance analyst at Standard & Poor's. "We should rather treat this bank as a government agency. It is used by the government as a tool to invest in politically and socially important but not always financially viable projects."

Ex. F (The New York Times describing VEB as "intertwined with Russian intelligence."); *see also* Ex. G (Bloomberg stating "VEB functioned as 'an extra-budgetary fund of the government for the implementation of special projects, a quasi-fiscal instrument.'").

VEB, unsurprisingly, contends that Russian law and its founding charters establish its independence from the Russian Federation. As an initial matter, these self-serving statutes are of limited value in U.S. courts. *Bancec*, 462 U.S. at 621–22, 103 S. Ct. at 2597–98 ("To give conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts.").

In any event, the laws that VEB points to actually demonstrate the significance Russian Federation's control over VEB. VEB relies on provisions of its enabling statute that appear to restrict Russian Government involvement in VEB affairs – for example, the statute says that "Russian Federation and local government authorities may not interfere . . . unless otherwise provided for by this Federal Law or any other federal laws." Pfaehler Decl. Ex. 2, Law 82-FZ ("Russian Law 82-FZ") at art. 6, ¶ 1 (emphasis added). But the statute *also* says that VEB must implement Russian Federation interests even when it conflicts with its own purposes:

> As instructed by the President of the Russian Federation and the Prime Minister of the Russian Federation, VEB.RF shall participate in the implementation of VEB.RF's projects of nationwide, strategic or high priority significance to the Russian economy even if they are not consistent with the principal areas, targets,

> limitations or principles applicable to VEB.RF's investment and financial activities in accordance with the procedure specified in this Federal Law.

*Id.* at art. 3, ¶ 5 (emphasis added); *see also id.* art. 3, ¶ 5.3. Moreover, the Russian Government must approve "VEB.RF's key investments and financing areas and performance indicators, quantitative limits on borrowings, other limits, general terms and conditions, loan and credit terms, equity financing and guarantee procedures, key debt recovery measures and guidelines, and general financial support measures for VEB.RF's entities." *Id.* art. 4, ¶ 6. This is a far cry from an independent institution – or, put more succinctly, VEB is independent only if and when Russia allows it to be.

In summary, even before discovery, information available publicly indicates that VEB may be liable for the judgments of the Russian Federation. But again, that question need not be answered at this time. What is important for present purposes is that Chabad's inquiries into VEB are not "bizarre," and under *NML Capital,* discovery should go forward.

## III. The Foreign Sovereign Immunities Act Does Not Shield VEB from Discovery

VEB also contends that the FSIA bars Chabad's discovery. While similarly premature, these objections are of no moment.

*First*, VEB confuses Chabad's discovery efforts with enforcement efforts, contending that Chabad has not complied with 28 U.S.C. § 1610(c) because it has not yet identified specific property in its subpoena. Judge Lamberth has already found that Chabad has complied with 1610(c) to the extent necessary *to seek discovery*. Addressing the same argument VEB raises now, the D.C. court explained:

> The Court concludes that the [U.S.] government's concerns are based on a misconception about the scope of a 1610(c) order and are therefore unfounded. A 1610(c) order, in the context of this case, *does not* authorize the attachment or execution of particular property—or any property at all. The proposed order is

> clear on this point, asking the Court to rule *only* that (1) a "reasonable period of time has elapsed following entry of judgment," (2) plaintiff "has given the proper notice to defendants that is required under 28 U.S.C. § 1608(e)," and (3) plaintiff "may enforce the judgment against defendants." Proposed Order, Apr. 4, 2011 [91–1]. Thus, to the extent the United States is concerned that such an order might authorize the attachment of property potentially immune under other statutes—such as art and cultural artifacts, 22 U.S.C. § 2459—that worry is unfounded. Any court, whether this or another, would be required to evaluate a proposed attachment of specific property in this case by reviewing the jurisdictional provisions of § 1610(a)-(b), as well as any other immunities that might apply. *See, e.g., Magness v. Russian Fed'n*, 84 F.Supp.2d 1357, 1360 (S.D.Ala.2000) (denying attachment of objects included in exhibit related to Russian Tsars under § 2459 without discussion of § 1610(c)).

*Agudasz Chasidei Chabad v. Russian Fed'n*, 798 F. Supp. 2d 260, 270-71 (D.D.C. 2011). Judge Lamberth's conclusion mirror those in *Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280, 297 (2d Cir. 2011)—cited by VEB—where the court denied without prejudice the petitioners' attempt to attach foreign assets without adequately identifying the foreign assets and FSIA exception, but noted "[n]othing in that ruling, which petitioners did not appeal, prevents them from pursuing Rule 69 discovery from the Banks as to China's potentially recoverable assets held within the United States." To the extent that Chabad attempts to attach specific property, it will address the specific requirements set forth in the statute.

*Second*, VEB contends that Chabad will be unable to execute on its judgments. The FSIA allows for execution against an asset when "the execution relates to a judgment establishing rights in property which has been taken in violation of international law." 28 U.S.C. § 1610(a)(3). The District Court for the District of Columbia ruled nearly ten years ago that Chabad "ha[d] satisfactorily shown that defendants expropriated both the Archive and Library from plaintiff in violation of international law." *Agudas Chasidei Chabad v. Russian Fed'n,* 729 F. Supp. 2d 141, 146 (D.D.C. 2010). VEB has not

explained why the sanctions judgment to enforce the previous judgment does not relate to that judgment. Nor does VEB explain why Chabad cannot seek discovery to enforce its underlying judgment ordering the return of the collection. But once again these arguments are both unfounded and premature.

## IV. Chabad's Discovery Requests Are Not Overbroad

VEB contends that Chabad's subpoenas "impose an undue burden on VEB, given their breadth, lack of particularity with which the documents are described, and the burden imposed on VEB." Mem. at 21. For the most part, these arguments are directed to subpoena topics concerning VEB's corporate structure, its related companies, and its commercial activities. *Id.* at 20–21.

VEB did not raise these concerns regarding burden and overbreadth prior to filing its motion to quash. In any event, Chabad's subpoena topics are directed to information that Chabad believes will ultimately lead to attachable assets, including information directed to the extent of the Russian Federation's involvement and control over VEB. But to the extent that VEB contends that more focused topics are appropriate, Chabad is willing to work with VEB to focus the scope of the discovery.

## V. VEB's Arguments Regarding the U.S. National Interest Should Be Disregarded

VEB's concerns over U.S. foreign policy need not detain the court long. Mem. at 22. The Supreme Court made clear that the FSIA was enacted to resolve and settle any questions regarding this country's policy and practice as it relates to foreign sovereign liability, and any changes to that policy should be directed to Congress. *NML Capital*, 573 U.S. at 146, 134 S. Ct. at 2258 ("These apprehensions are better directed to that branch of government with authority to amend the Act—which, as it happens, is the same branch that forced our retirement from the

immunity-by-factor-balancing business nearly 40 years ago."). VEB offers no reason to rehash issues the Supreme Court has already addressed.

**VI. There is No Basis to Stay Chabad's Subpoena**

Finally, VEB requests a stay "pending resolution of issues identified in the United States' Statements of Interest[.]" Mem. at 23. The Government's Statement of Interests was filed over three years ago. It rests on the idea that discovery is improper in this case because it could not lead to executable assets. According to the Government, any assets that Chabad identified would not be subject to execution because the FSIA "precludes attachment of Defendants' assets here in the United States as part of an effort to enforce a monetary sanctions judgment[.]" Statement of Interest of the United States at 2, ECF No. 151, Case No. 05-cv-1548 (D.D.C.).

Chabad will not address the merits of the Government's position here. As discussed above, it is unnecessary. Moreover, the Government has now changed its views on this issue. In a brief filed with the Supreme Court by the Solicitor General, the Government took the position that sanctions imposed on the foreign sovereign are proper. The Government's submission is worth reciting at length:

> [P]etitioner's arguments (Pet. 29-33) against enforceability of contempt sanctions are misguided. The provisions governing execution of judgment are part of the Act's "comprehensive set of legal standards governing claims of immunity in every *civil action*," *NML Capital*, 573 U.S. at 141 (emphasis added); see *id.* at 142; 1976 Hearings 26 (describing those provisions as "provid[ing] U.S. citizens with the remedy of execution"); 1976 House Report 12. No text or legislative history indicates that the immunity from execution concerned judgments in criminal cases. See Supp. App. 9a-11a.
>
> Furthermore, assuming the FSIA applies, its exceptions to immunity from execution of judgment would apply as well. The FSIA provides broader exceptions for agencies and instrumentalities than for foreign states. 28 U.S.C. 1609-1611. For agencies and instrumentalities (but not states) that are "engaged in commercial activity in the United States," their property in the United States is not immune from execution if "the judgment relates to a claim for which the

> agency or instrumentality is not immune by virtue of" the commercial-activity exception, "regardless of whether the property is or was involved in the act upon which the claim is based." 28 U.S.C. 1610(b)(2).
>
> If the FSIA applies and the court enters a fixed, monetary judgment, the exception in Section 1610(b)(2) would be satisfied: Petitioner is engaged in commercial activity in the United States, has property in the United States, and the monetary judgment would "relate[] to a claim for which [petitioner] is not immune by virtue of" the commercial-activity exception, 28 U.S.C. 1610(b)(2). As petitioner acknowledges (Pet. 30), the term "claim" includes not just a "demand for money," but also a demand for "property" and "*a legal remedy to which one asserts a right*; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for." *Black's Law Dictionary* 301 (10th ed. 2014) (def. 3) (emphasis added). The subpoena issued by the grand jury required the production of documents, and the government's request for enforcement of the subpoena sought to compel production of the evidence to which the grand jury was entitled, backed by sanctions if petitioner did not produce it. That request constituted a "claim" within the meaning of the FSIA, and the district court's contempt order clearly "relates" to that claim, 28 U.S.C. 1610(b)(2).

Ex. H, at 25–27 (underscore added; italics in original). The Government thus has abandoned its argument that the FSIA does not allow the execution of a judgment entered against a foreign sovereign as a sanction for non-compliance with a court order. There is therefore no reason to stay Chabad's subpoena pending a non-existent dispute.

## **CONCLUSION**

For these reasons, VEB's motion to quash should be denied.

Respectfully submitted,

Dated: June 27, 2019

By: */s/ Steven Lieberman*

Steven Lieberman (SL 8687)
Rothwell, Figg, Ernst & Manbeck, P.C.
607 14th St., N.W., Suite 800
Washington, DC 20005
Phone: 202-783-6040
Facsimile: 202-783-6031
E-Mail: slieberman@rfem.com

*Counsel for Agudas Chasidei Chabad of United States*